# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| THREE TREE ROOFING, | No. 57042-4-II |
| Respondent, | |
| v. | |
| THE DEPARTMENT OF LABOR & INDUSTRIES OF THE STATE OF WASHINGTON, | UNPLUBLISHED OPINION |
| Appellant. | |

GLASGOW, C.J.—Three Tree Roofing Company received Department of Labor and Industries safety citations in 2018 and early 2019 for crew members not having appropriate fall protection. In September 2019, an inspector for the Department issued another citation for a repeat fall protection violation. Three Tree appealed the citation to the Board of Industrial Insurance Appeals, arguing an affirmative defense that the violation was due to unpreventable employee misconduct. The Board found that Three Tree failed to prove all of the elements of the affirmative defense. The Board affirmed the Department's citation against Three Tree.

The superior court then reversed, finding Three Tree proved the affirmative defense. The Department appeals, arguing that substantial evidence supports the Board's conclusion that Three Tree did not successfully prove unpreventable employee misconduct. We reverse the superior court and affirm the Board's decision because substantial evidence in the record supports the Board's conclusion. Although there is some evidence in the record supporting the affirmative defense, we do not reweigh the evidence on substantial evidence review.

FACTS

I. BACKGROUND

In September 2019, Jessica Wilke, an inspector for the Department of Labor and Industries, conducted a workplace safety and health inspection of a roofing project being performed by Three Tree Roofing Company in Buckley, Washington. Wilke observed several Three Tree employees working without fall protection on a steep "roof of a two-story home approximately 20 feet above concrete and gravel." Clerk's Papers (CP) at 320. Each of the workers "on the second story roof . . . [had] a harness on, but . . . didn't appear to have any rope or lifeline attached to that harness." CP at 149. This exposed the workers to falls that could "result in permanent disability or death." CP at 321. The project's crew leaders, Misael Sanchez and Denis Sanchez, were among those without fall protection.

Under RCW 49.17.120, the Department cited Three Tree for violating former WAC 296-155-24609(7)(a)(i) (2016), which required employees to wear fall protection gear when working above certain heights, depending on the pitch of the roof. The company had been cited twice before for the same fall protection violation – once in August 2018 and again earlier in 2019. One of these violations involved members of the same crew. The Department assessed a monetary penalty for this repeat violation of $15,000.[1]

Three Tree appealed the citation through the Department's internal review process. The Department affirmed the violation, but reduced the monetary penalty to $10,500. Three Tree appealed the Department's decision to the Board of Industrial Insurance Appeals.

---

[1] The Department also cited Three Tree for using a ladder that did not extend "at least 3 feet above the landing surface," exposing workers to "fall hazards and serious injuries which could result in hospitalization or limited disability." CP at 323. The Board found that the Department had appropriately penalized Three Tree for the ladder violation. The superior court affirmed. Three Tree does not dispute the ladder violation on appeal.

## II. Hearing Before the Board of Industrial Insurance Appeals

On appeal to the Board, Three Tree argued in part that the safety violation was due to unpreventable employee misconduct. Unpreventable employee misconduct is an affirmative defense to an employer's safety violation that requires the employer to meet four elements. RCW 49.17.120(5)(a). The fourth element, that the employer must prove "[e]ffective enforcement of its safety program as written in practice and not just in theory," is the only element in dispute in this case. *Id.*; CP at 29.

During the hearing before the Board, Wilke testified that she spoke with Three Tree's owner, Neil Haugen, on the day of the violation. Wilke reported that Haugen called the workers a "rogue crew," because "they had been written up [before]." CP at 188. Haugen also told her there was a "20 percent chance [company officials] might stop by the site" for "random site inspections." CP at 160.

Wilke also spoke to the crew leaders, Misael and Denis, during the inspection. As "lead roofer," she stated, Misael was supposed to "conduct[] the walk-around safety inspections," "fill[] out the fall protection work plans and go[] over that with the employees," and "have disciplinary responsibility and enforcement for safety rules on site." CP at 159. Misael told her that he had "authority to enforce safety" rules but had "never used it." *Id.*

Wilke testified that during the inspection, she was provided with a workplace inspection checklist filled out by Haugen and a fall protection work plan filled out by Misael. She noted that the workplace inspection checklist "[did not] mention fall protection," and the fall protection work plan was "filled out incorrectly" such that multiple fall protection systems were inaccurately marked as being used by the team. CP at 204, 206. She testified that Misael said that was how he always completed the form.

In support of its defense, Three Tree provided evidence of its safety procedures. Haugen testified that "when an employee is hired, there is a first day orientation" that covers "safety practices and protocols," including "harnesses and safety equipment." CP at 239. The "safety manager," as well as Haugen and his business partner, conducted "spot checks" and "bi-weekly . . . full company-wide safety meeting[s]." CP at 240. These safety meetings were conducted in both English and Spanish.

Three Tree also presented evidence of internal compliance checks performed on past jobs, including those on which Misael and Denis were listed as project crew leaders. The notes for one of these checks completed in June 2019 stated, "Spoke with crew leaders about incident last month and stressed the necessity of always wearing harnesses. Spoke to each member of the crew to make sure they knew it is 100 percent not . . . optional." CP at 194-95. Three Tree also provided evidence of the "fall protection work plan"— in English and Spanish — that "crew leaders use to do their walk-around safety inspection before work is done on every job." CP at 202.

Haugen explained Three Tree's "three strikes" disciplinary policy. CP at 199. The disciplinary policy escalated from a "verbal warning," to a written warning, to a "third strike" that was "typically[] termination." CP at 279-80. When asked if the company documented verbal warnings, Haugen testified, "not as much." CP at 280. Haugen further testified that he reported verbal warnings if they were "necessary to sink the gravity of the situation." CP at 295. Regardless, Haugen believed that Three Tree "consistently enforced [the] disciplinary policy with regard to all employees [on the] day of [Wilke's] inspection." CP at 287. Consistent with the company's disciplinary policy, Three Tree fired Misael and Denis. Wilke's inspection was the third time both crew leaders had been found "on a roof without proper L&I and OSHA fall protection." CP at 547-48. They had been warned after their second offenses, but Wilke noticed, by "looking at the dates,"

4

that these warnings were in response to "L&I inspections and violations, not random [company] visits." CP at 200.

Wilke said she would have expected Three Tree "to be making more random visits" to its work sites to check for safety violations. CP at 216. When asked about his statement that there was a "20 percent chance" of a random inspection, Haugen said, "[I]f you do the math on four crews, two a week, . . . theoretically, that's, . . . 20 percent a week. I would think over the course of a month you would get two or three in there." CP at 272. Haugen said they performed "one to two per week . . . per person, but . . . if possible, . . . would do three a week sometimes." CP at 271-72. When performing these "surprise inspect[ions]," Haugen testified that company officials would use a safety inspection checklist. CP at 265. He said that his business partner "did not fill out forms for every" inspection; "[i]t was more about making sure things were right, than the documentation." CP at 271. Haugen also testified that he knew "for certain" they had done many more inspections than the documentation presented during the hearing suggested. CP at 271. In contrast, the workers said they "might see someone, maybe, once a month." CP at 188.

Haugen's "rogue crew" comment expressed his disappointment in the crew. CP at 273. He was surprised they would be so careless after receiving write ups and retraining. Haugen explained that the crew knew the rules and he asserted that their decision to ignore the safety requirements was intentional.

### III. THE BOARD'S DECISION

The Board affirmed the Department's citations against Three Tree, concluding that the fall protection violation was not due to unpreventable employee misconduct under RCW 49.17.120(5).

Three Tree met the first three elements of unpreventable employee misconduct: the company had "work rules designed to prevent the violation, . . . adequately communicated these

rules to its employees," and showed that it took "steps to discover violations." CP at 27. However, the Board found that the company did not meet the fourth element, failing to "show[] by a preponderance of the evidence" that its "safety program was not effective in practice." CP at 28, 29. The Board explained:

> The employer had two prior fall protection violations within 15 months of the violations at issue in this appeal. All of the workers working at the inspected job site were working without fall protection at the time of the inspection, including two crew leaders who had responsibility for enforcing the safety program. This was the third fall protection violation for the two crew leaders and one other worker. The three workers had been told of their first two violations, and told that a third violation would result in termination, but that did not stop them from working without the required fall protection.

CP at 29 (Finding of Fact (FF) 11). Three Tree's "failure to ensure that its employees were using appropriate fall protection" during the September 2019 inspection "exposed the employees to the risk of serious bodily harm." *Id.* at 29 (FF 7). The company "either knew or should have known about the hazard," especially in view of past citations for fall violations. *Id.*

## IV. APPEAL TO SUPERIOR COURT

Three Tree appealed the Board's decision to superior court. A superior court reviewing a Board decision must affirm if substantial evidence supports the Board's findings. RCW 49.17.150(1). The court held that the Board erred, concluding that Three Tree satisfied the elements of the affirmative defense because Three Tree's safety plan was "workable," and the "amount of work that [Three Tree] [was] doing," as well as the low incidence of reported injuries, "sp[oke] to the effectiveness of [the] safety program." Verbatim Rep. of Proc. at 17-18. The court also stated that the Department had treated the fourth element as a "strict liability requirement," in which any violation "in and of itself is proof that all [the employer] [has] is a paper program[] [that] [is] not actually being followed." *Id.* at 17.

Accordingly, the court concluded that the Department had erroneously cited Three Tree for the fall protection violation. The court decided that substantial evidence did not support a serious violation because Three Tree's violation "was the result of unpreventable employee misconduct." CP at 590.

The Department appeals and asks us to affirm the Board's decision.

ANALYSIS

An employer's Washington Industrial Safety and Health Act of 1973 (WISHA), chapter 49.17 RCW, violation may be excused if it was due to unpreventable employee misconduct. *Pro-Active Home Builders, Inc. v. Dep't of Lab. & Indus.*, 7 Wn. App. 2d 10, 20, 432 P.3d 404 (2018). The affirmative defense applies where "'employees disobey safety rules despite the employer's diligent communication and enforcement.'" *Id.* (quoting *Asplundh Tree Expert Co. v. Dep't of Lab. & Indus.*, 145 Wn. App. 52, 62, 185 P.3d 646 (2008)). To establish unpreventable employee misconduct, an employer must demonstrate:

> (i) A thorough safety program, including work rules, training, and equipment designed to prevent the violation;
> (ii) Adequate communication of these rules to employees;
> (iii) Steps to discover and correct violations of its safety rules; and
> (iv) Effective enforcement of its safety program as written in practice and not just in theory.

RCW 49.17.120(5)(a).

I. STANDARD OF REVIEW

We review Board decisions regarding WISHA violations directly, "based on the record before the agency." *Legacy Roofing, Inc. v. Dep't of Lab. & Indus.*, 129 Wn. App. 356, 363, 119 P.3d 366 (2005). The Board's findings are conclusive if they are "'supported by substantial evidence on the record considered as a whole.'" *Id.* (quoting RCW 49.17.150(1)). Evidence is substantial if it is in "'sufficient quantum to persuade a fair-minded person of the truth of the

declared premise.'" *Id.* (quoting *Fred Hutchinson Cancer Rsch. Ctr. v. Holman*, 107 Wn.2d 693, 712, 732 P.2d 974 (1987)). We do not reweigh evidence in a substantial evidence review of the record; instead, we construe the "evidence in the light most favorable to the party that prevailed before the Board," here, the Department. *Potelco, Inc. v. Dep't of Lab. & Indus.*, 194 Wn. App. 428, 434, 377 P.3d 251 (2016) (*Potelco* I).

### III. UNPREVENTABLE EMPLOYEE MISCONDUCT

The Department argues that Three Tree's unpreventable employee misconduct defense fails because the final element of the affirmative defense was not satisfied. The Department asserts that the Board properly found that Three Tree's safety program was not effective in practice. We agree.

We review the record to evaluate whether the Department presented substantial evidence that Three Tree failed to show "[e]ffective enforcement of its safety program as written in practice and not just in theory." RCW 49.17.120(5)(a)(iv). To show that a safety program was effectively enforced in practice, the employer must demonstrate that the misconduct "was an isolated occurrence and was not foreseeable." *Pro-Active Home Builders*, 7 Wn. App. 2d at 20; *Legacy Roofing*, 129 Wn. App. at 366. Misconduct may be foreseeable where there is a history of prior violations or lax enforcement, and a supervisor's violation supports an inference of lax enforcement because supervisors are responsible for ensuring employee safety. *Legacy Roofing*, 129 Wn. App. at 367; *Potelco* I, 194 Wn. App. at 437-38. Documentary evidence of the employer's compliance with a progressive disciplinary policy can show an effectively implemented and enforced safety program in practice. *BD Roofing, Inc. v. Dep't of Lab. & Indus.*, 139 Wn. App. 98, 113-14, 161 P.3d 387 (2007).

We agree with the Department that there is substantial evidence in the record to support the Board's finding that Three Tree failed to enforce its employee safety program in practice.

A.    Foreseeability

1.    Prior violations

The Department argues that Three Tree's prior fall protection violations, some involving the same crew leaders; its decision to continue to allow these noncompliant crew leaders to supervise crews together; and its failure to consistently check on these crew leaders to ensure adequate safety compliance, all demonstrate the foreseeability of the violation at issue. Three Tree responds that in the context of the "[h]undreds of roofing jobs . . . completed before the September 2019 inspection," the prior violations "did not create foreseeability that these specific employees would violate the fall protection requirements." Br. of Resp't at 18-19. Three Tree asks that we look to the "employer's entire safety *program*, . . . not just the consequences of a single event," and argues that "bas[ing] [the] ineffectiveness of its safety program on the alleged safety violation itself" amounts to a "strict liability standard that if adopted, negates the unpreventable employee misconduct defense." *Id.* at 19.

We have rejected this very argument before, holding that prior identical safety violations are evidence of foreseeability, even if they are not dispositive. "[T]he existence of prior violations does not absolutely bar use of the unpreventable employee misconduct defense." *Washington Cedar & Supply Co., v. Dep't of Lab. & Indus.*, 119 Wn. App. 906, 913, 83 P.3d 1012 (2004). However, "prior citations for similar conduct may . . . provide notice to the employer of the problem." *Id.* Therefore, similar violations in the past can serve as "*evidence* that the employee conduct was foreseeable and, therefore, preventable" even though such evidence is not dispositive of foreseeability. *Legacy Roofing*, 129 Wn. App. at 367 (emphasis added).

In *Washington Cedar*, we determined that prior similar safety violations supported the Board's finding of an ineffectively enforced safety program. 119 Wn. App. at 913. The Department cited the employer, Washington Cedar, for a fall protection violation after observing an "employee standing on the roof . . . not wearing fall restraints or fall arrest gear." *Id.* at 910. Washington Cedar had "two prior fall protection violations . . . within three years of the instance at issue." *Id.* We concluded that substantial evidence supported the Board's finding that Washington Cedar did not demonstrate an effectively enforced safety program. *Id.* at 912-13. The two prior fall protection violations, supported by unidentified "additional evidence," supported the Board's conclusion. *Id.* at 913. Washington Cedar therefore failed to show unpreventable employee misconduct. *Id.*

In *Legacy Roofing*, we upheld the Board's determination that a single prior fall protection violation made the subsequent fall protection violation at issue foreseeable. *Legacy Roofing*, 129 Wn. App. at 367-68. The Department cited the employer, Legacy, for violating WISHA standards after observing a worker on the roof without fall protection gear. *Id.* at 359-60. Legacy had been cited for the same violation 23 months before. *Id.* at 360. Legacy argued that it was "impossible" to show effective enforcement of its safety program because the "Board assumed that the mere fact of the violation showed that Legacy's program was not effective in practice." *Id.* at 367. We disagreed, concluding that even from "one prior identical violation," it was "sufficiently foreseeable that one of Legacy's employees would again work on the roof of a house without wearing required fall safety equipment." *Id.* at 367-68. We concluded that substantial evidence in the record supported the Board's conclusion that Legacy did not meet all the elements of unpreventable employee misconduct, including that its safety program was not effective in practice. *Id.* at 368.

Here, the violation was similarly foreseeable in light of Three Tree's past violations in 2018 and earlier in 2019, which involved the same crew leaders. Three Tree's strict liability argument is akin to the argument rejected in *Legacy Roofing,* namely that the Board had assumed "the mere fact of the violation showed that Legacy's program was not effective in practice." *Legacy Roofing*, 129 Wn. App. at 367. Like the court in *Legacy Roofing*, we disagree.

The Board did not consider only the mere fact of the violation when it affirmed the citation here. Instead, as in *Washington Cedar* and *Legacy Roofing*, the Board considered Three Tree's "two prior fall protection violations within 15 months of the violation[] at issue" in concluding that the company's safety program was ineffective in practice. CP at 29 (FF 11). "This particular crew had been involved in a fall protection violation just a few months earlier," and for "three of the workers, including both crew leaders," this violation was "their third offense." CP at 28. Additional evidence factored into the Board's decision as well, as it did in *Washington Cedar*, including that: Three Tree chose to keep this crew together despite their prior violations rather than splitting them up, the crew said they experienced random safety checks only once per month, one crew leader said he had never used his authority to enforce safety requirements, and there was testimony that discipline was only imposed when the Department found violations.

### 2. Lax enforcement

The Department argues that because "on-site supervisors violated the fall protection safety rules," Three Tree's "enforcement of its safety program was lax and not effective in practice." Br. of Appellant at 29. Three Tree concedes that "[s]upervisory employees violating safety rules is potentially evidence of lax enforcement of safety rules," but argues that in this case, it effectively enforced its safety program in practice because of its site inspections, employee training programs,

routine supervision, and consistent discipline of safety violations. Br. of Resp't at 28. We agree with the Department.

Lax enforcement of safety rules can make a violation foreseeable. *Potelco* I, 194 Wn. App. at 437-38. Lax enforcement may be inferred from "'negligent behavior by a supervisor or foreman [that] results in dangerous risks to employees under his or her supervision.'" *Id.* at 437 (quoting *Brock v. L.E. Myers Co.*, 818 F.2d 1270, 1277 (6th Cir. 1987)). And, "knowledge that an employee is flouting safety rules and . . . may require additional monitoring" supports the foreseeability of a violation. *Pro-Active Home Builders*, 7 Wn. App. 2d at 21.

In *Potelco* I, Division One affirmed the Board's finding that the employer, Potelco, did not effectively enforce its safety program in part because of "Potelco's lax enforcement of its safety rules." 194 Wn. App. at 438. The foreperson of a crew working on a "de-energized high voltage line" allowed the project to start despite knowing that an equipotential zone, a Department safety requirement that "protects workers . . . from electrocution and death," had not been created. *Id.* at 431-32. The foreperson was "responsible for enforcing safety rules at the work site, . . . authorized . . . to stop work and to discipline employees who broke safety rules," and could "terminate employees for safety violations." *Id.* at 432. A crew member "suffered serious electrical shock injuries" when the "line became charged with dangerous electrical energy." *Id.* at 432-33. The foreperson's "participation in the violation," especially as someone "empowered with supervisory authority . . . rais[ed] an inference of 'lax enforcement and/or communication' of Potelco's safety policy." *Id.* at 438. Substantial evidence supported the Board's finding that Potelco did not effectively enforce its safety program, and the court affirmed the Board's rejection of the unpreventable employee misconduct defense. *Id.*

In *Potelco, Inc. v. Department of Labor & Industries*, 7 Wn. App. 2d 236, 250, 433 P.3d 513 (2018) (*Potelco* II), we again held that Potelco had failed to "demonstrate effective implementation of its safety program in practice." The project involved installing new power lines, and an equipotential zone was not established at the work area. *Id.* at 240. The crew foreperson working a few hundred feet away from the other workers, cut a power line that "blocked a residential driveway, . . . but [the crew foreperson]did not communicate this fact to the rest of the crew." *Id.* A crew member, unaware the line had been cut, picked it up and pulled it, making contact with an energized connection device, which resulted in him receiving a mild electric shock. We concluded Potelco "did not present any evidence of specific examples of corrective or disciplinary action other than overarching changes to its safety training and the discipline of the four linemen involved." *Id.* at 250. The "project foreman's involvement" suggested the violation was not an "isolated instance[] of unpreventable employee misconduct." *Id.* at 250-51.

In *Pro-Active Home Builders*, we held that the employer, Pro-Active, did not effectively enforce its safety program in practice. 7 Wn. App. 2d at 22. One of Pro-Active's superintendents "observed a lead worker . . . on the roof . . . without safety equipment," issued a "verbal warning," and subsequently "left [the worker] in charge of safety at the site." *Id.* at 13. Pro-Active argued that the employee had "just been reminded of the safety requirements," so it would be "foreseeable that the employee would be cognizant and abide by the rules." *Id.* at 21. We disagreed, holding the misconduct was foreseeable because "[d]espite seeing [the worker] commit a safety violation, the superintendent left him in charge of safety and made no further attempt to monitor [the worker's] compliance with safety rules." *Id.*

Like in *Potelco* I and *Potelco* II, Three Tree's crew leaders, Misael and Denis, were participants in the misconduct, failing to wear fall protection gear themselves and failing to make

their crew do so. Both crew leaders had been involved in two prior fall protection violations, a fact that the Board found contributed to Three Tree's ineffective safety program. Although Misael, as lead roofer, did not have authority to terminate employees, he was empowered to enforce safety rules. He admitted to never doing so. According to Wilke, Misael also incorrectly completed the safety inspection form before beginning work, and told her he completed the forms the same way every time.

Haugen told Wilke the workers were a "rogue crew." CP at 273. Three Tree suggests "his choice of words reflect[s] shock and dismay." Br. of Resp't at 24. While this may be true, Haugen acknowledged that this crew had been the subject of citations in the recent past. Despite these violations, Haugen still chose to keep Misael and Denis in charge of safety enforcement at their work sites. While there is evidence of compliance checks on Misael's and Denis's past projects in which Three Tree officials emphasized the importance of fall protection, as in *Pro-Active Home Builders*, merely warning employees who were known to ignore fall protection rules, without additional monitoring, does not defeat foreseeability.

Three Tree did present evidence of an established written safety program, regular safety trainings, and past disciplinary action against noncompliant workers. But viewing the record in the light most favorable to the Department, as we must, the crew leaders' repeated flouting of the company safety rules, Misael's apparent misunderstanding (or disregard) of the safety inspection process and failure to enforce the safety program, in conjunction with Haugen's awareness of the crew's past violations, amount to substantial evidence establishing that this particular fall violation was attributable to lax enforcement.

Three Tree cites to a decision by the Board, *In re Tyson Fresh Meats*, No. 17 W1079 (Wash. Bd. of Indus. Ins. Appeals Dec. 17, 2018),[2] to argue that we should not over emphasize the misconduct of a supervisor when evaluating how effective its safety program was in practice. In *Tyson*, a supervisor "was reassembling meat grinders" after they had been cleaned, "a task that he [did] not typically perform." No. 17 W1079, at 2. He failed to take certain safety precautions before reaching into a piece of equipment that unexpectedly "turned on and amputated two of his fingers." *Id.* The Board held that in view of "abundant evidence of [the company] disciplining its employees for" violations of these particular safety procedures, the supervisor's "non-compliance . . . was an isolated incident and was not foreseeable." *Id.* at 6, 8.

This case is distinguishable from *Tyson* because the misconduct of the Three Tree crew was not isolated. Three Tree knew of the crew leaders' past fall protection violations and still chose not to separate them onto different crews or more closely supervise them. And Three Tree did not provide evidence of robust discipline of employees violating fall protection requirements.

We hold that due to Three Tree's prior fall protection violations, as well as demonstrated lax enforcement, the September 2019 violation was not an isolated incident, but instead it was foreseeable. Substantial evidence in the record supports the Board's finding that Three Tree's safety program was not effective in practice.

3.      Lack of injury

The Department contends that the "superior court erred when it determined [in part] that, because [Three Tree] did not have any reported injuries," the safety program was effective in practice. Br. of Appellant at 45. Three Tree counters that "at the time of the September 2019

---

[2] http://www.biia.wa.gov/DO/17W1079_ORD_20181217_DO.PDF

inspection," it had "no workplace injuries of record and no chronic safety issues with any particular employee or crew." Br. of Resp't at 18. We agree with the Department.

An employer's history of few employee injuries has no bearing on whether a violation is due to unpreventable employee misconduct. *See Western Oilfields Supply v. Dep't of Lab. & Indus.*, 1 Wn. App. 2d 892, 908-09, 408 P.3d 711 (2017). So long as the misconduct was foreseeable, the employer's safety program cannot have been effective in practice. *Id.* at 909. In *Potelco* II, we concluded that the company's safety program was not effective in practice even though the cut power line resulted in the employee "receiv[ing] no injuries besides [a] tingling in his hand." 7 Wn. App. 2d at 241. In *Western Oilfields*, the company argued that "only one injury took place in the past five years," and "it had a 'lower than average amount of workers['] compensation claims.'" 1 Wn. App. 2d at 908-09 (alteration in original). Regardless, Division One held that the safety program was not effective in practice because it was foreseeable that the violation would happen. *Id.* at 909.

While nobody was hurt in this case, *Potelco* II and *Western Oilfields* demonstrate that serious injury is not requisite to a finding of an ineffective safety program. As the incident in *Potelco* II posed an electrocution risk to the employee that did not result in injuries, Three Tree "either knew or should have known" that working without fall protection on the roof "exposed the employees to the risk of serious bodily harm." CP at 29 (FF 7). While Three Tree claims that its injury free record was evidence of the efficacy of its safety program, Three Tree's prior fall protection violations, its failure to bring this crew into compliance, and its lax enforcement of safety measures all show that the misconduct was foreseeable.

B.      Documentary Evidence

1. Documentation of verbal warnings

The Department argues that "[b]y Haugen's own admission, Three Tree Roofing did not usually document verbal warnings, which was inconsistent with its written disciplinary policy." Br. of Appellant at 41. Three Tree claims the Department did not make this argument before the Board, and it is therefore improper. We disagree.

Three Tree relies on RCW 49.17.150(1), which governs appeals of Board decisions to superior court. The statute provides that "[n]o objection that has not been urged before the board shall be considered by the [superior] court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." RCW 49.17.150(1); *see also Dep't of Lab. & Indus. v. Nat'l Sec. Consultants, Inc.*, 112 Wn. App. 34, 36-37, 47 P.3d 960 (2002) (distinguishing the "permissive language in RAP 2.5(a)" from what is "mandate[d]" by RCW 49.17.150). Three Tree does not cite to any case; however, that applies this language in RCW 49.17.150(1), beyond imposing a requirement that a party objecting to an aspect of a Department decision must do so first before the Board.

Moreover, the Department has consistently argued that Three Tree failed to meet the fourth element of the affirmative defense, because it did not effectively enforce its employee safety program in practice. Three Tree's failure to comply with its own employee discipline policies may be one reason for finding a lack of effective enforcement, but it is not a whole new argument. A Department witness testified before the Board more generally about the limited nature of the discipline records for the crew in question, emphasizing that their documented discipline related only to instances of prior Department involvement. The Department therefore raised before the Board the adequacy of Three Tree's application and documentation of its employee discipline

policies. Finally, Three Tree does not argue that it was deprived of an opportunity to provide further evidence related to documentation of written warnings, perhaps because its own attorney elicited the evidence the Department now relies upon. We therefore consider Three Tree's lack of documentation of verbal warnings in our analysis.

### 2. Lack of documentation of effective employee discipline

The Department argues that Three Tree demonstrated "deficient record-keeping practices" and failure to comply with its written disciplinary policies, which also support the Board's decision that the fourth element was not met. Br. of Appellant at 44-45. We agree.

An employer may support the effectiveness of its safety program with documented evidence of the "'implementation of its written safety program.'" *BD Roofing*, 139 Wn. App. at 113 (quoting *Brock*, 818 F.2d at 1277). "Merely showing a good paper program does not demonstrate effectiveness in practice." *Id. See Pro-Active Home Builders*, 7 Wn. App. 2d at 21.

In *BD Roofing*, we affirmed the Board's finding that although the employer, BD, met the first three elements of the unpreventable employee misconduct defense, there was no effective enforcement of the program in practice. 139 Wn. App. at 112-13. BD had "'developed a fall protection work plan,'" provided safety trainings in both English and Spanish, and had "'safety directors and corporate officers'" assigned to discovering and correcting violations of safety rules. *Id.* at 111-12. We concluded that even so, there was no evidence that BD's safety inspectors "actually fired employees because they violated the safety rules." *Id.* at 113. Because "fall protection violations were clearly a recurring and foreseeable problem for BD," we upheld the Board's determination that the safety program was ineffectively enforced in practice. *Id.* at 114.

In *Potelco* I, Division One addressed Potelco's failure to comply with its written safety program. 194 Wn. App. at 436. Even when employees were "caught violating safety rules, they

were not consistently disciplined or penalized." *Id.* Potelco's policy required that "all discipline — including verbal warnings — be documented in writing." *Id.* Yet, "safety coordinators admitted that Potelco rarely documented verbal warnings." *Id.* We held that this was substantial evidence supporting the Board's finding that "Potelco failed to effectively enforce its written safety program in practice." *Id.* at 438.

There is no question that Three Tree had written safety policies in place. Similar to BD's program, Three Tree had a fall protection work plan, provided safety trainings and documents in Spanish for Spanish speaking workers, and had a dedicated safety manager. Three Tree did provide documented evidence that it enforced some of its safety and disciplinary policies, such as warnings given to employees after violations of the company's policies. In-line with its "three strikes" policy, Three Tree also terminated four crew members, including crew leaders Misael and Denis, but this occurred *after* the September 2019 violation in question here.

The record includes only notices of termination that occurred in response to the September 2019 violation. As Wilke testified, Misael's and Denis's second offenses were issued on the same days that the Department conducted inspections of Three Tree work sites, rather than in response to internal company site visits. Three Tree provided no other evidence of employee discipline for violations of safety rules.

Haugen testified that Three Tree performed a few random inspections, "theoretically, . . . 20 percent a week," amounting to "two or three" "over the course of a month" per crew. CP at 272. When performing these surprise inspections, Haugen testified that company officials would use a safety inspection checklist, some of which are included in the record. Yet, Haugen mentioned that his business partner "did not fill out forms for every" inspection; "[i]t was more about making sure things were right, than the documentation." CP at 271. Three Tree did not adequately

document its verbal warnings to employees as discussed above. As in *Potelco* I, this indicates that Three Tree did not follow its written safety policies with respect to its safety inspection checklists and it did not consistently document surprise inspections. Substantial evidence supports that Three Tree did not provide sufficient documentation that its safety program was effectively enforced in practice.

CONCLUSION

We reverse the superior court and affirm the Board's decision. Substantial evidence in the record supports the Board's finding that Three Tree's safety program was not effective in practice. The Board correctly concluded that the fall protection violation was not the result of unpreventable employee misconduct.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, CJ

We concur:

Maxa, J.

Veljacic, J.