[No. 34886-1-II.   Division Two.   April 24, 2007.]

BD ROOFING, INC., *Appellant*, v. THE DEPARTMENT OF LABOR AND INDUSTRIES, *Respondent*.

---

*Aaron K. Owada* (of *Law Offices of Aaron Owada and AMS Consulting*), for appellant.

*Robert M. McKenna, Attorney General,* and *Bourtai B. Hargrove, Assistant,* for respondent.

¶1 VAN DEREN, J. — BD Roofing, Inc., appeals the Board of Industrial Insurance Appeals' (Board) determination that the Department of Labor and Industries (Department) proved its prima facie case against BD for a repeat serious violation of failing to ensure that its employees use fall protection safety equipment. BD also claims that the Board erred in its conclusion that BD failed to prove effective enforcement of its safety program in practice, not just in theory, thus denying BD's affirmative defense of employee misconduct for a serious violation of the Washington Industrial Safety and Health Act of 1973 (WISHA), chapter 49.17 RCW. Finally, BD alleges and the Department agrees that the Board's industrial appeals judge (IAJ) erred by miscalculating the applicable penalty for the citation after both parties stipulated to a specific base penalty. The Department does not contest the trial court's correction of the penalty. Finding no other error, we affirm the Board's determinations and the penalty imposed by the trial court.

## FACTS

¶2 On October 29, 2003, the Department's compliance safety and health officer, Larry Adams, observed four or five

BD employees tearing old roofing material from a roof located at 7024 27th Street West, University Place, Washington. Although the workers were wearing harnesses, they had not secured the harnesses to the roof with lanyards and anchors as required by WAC 296-155-24510.[1] As Adams approached the work site, the workers climbed down from the roof. The first person Adams spoke with was Diego Valentino, the worker in charge of the site. Adams asked Valentino to show him the site specific fall protection work plan required by WAC 296-155-24505.[2] Valentino was unable to produce a fall protection work plan for the site but completed a new work plan and posted it in Adam's presence.

¶3 Adams cited BD for a repeat serious violation of WAC 296-155-24510 for failing to ensure that employees exposed to a fall hazard of 10 feet or more used lanyards and anchors to prevent falls (item 1-1a). Adams also cited BD for a repeat serious violation of WAC 296-155-24505(1) for failing to ensure that the company completed a fall protection work plan for the site and failing to have the plan available for inspection on request (item 1-1b).

¶4 BD had received eight citations for violations of the same WAC standards during the previous three years. Seven included violations of both WAC 296-155-24505(1) and WAC 296-155-24510, while the eighth citation included a violation of only WAC 296-155-24505(1).[3]

---

[1] "When employees are exposed to a hazard of falling from a location 10 feet or more in height, the employer shall ensure that fall restraint, fall arrest systems or positioning device systems are provided, installed, and implemented." WAC 296-155-24510.

[2] WAC 296-155-24505 provides:

(1) The employer shall develop and implement a written fall protection work plan including each area of the work place where the employees are assigned and where fall hazards of 10 feet or more exist.
(2) The fall protection work plan shall:
. . . .
(g) Be available on the job site for inspection by the [D]epartment.

[3] The IAJ vacated the WAC 296-155-24505(1) violation after the parties stipulated to eight violations with a penalty of $21,600.

¶5 During the board hearing, Adams demonstrated how repeat violations increase the total penalty (violation of $1,000 with two prior repeat violations would be $1,000 times 3 = $3,000). The parties stipulated to a monetary penalty of $21,600, based on a repeat factor of eight.

¶6 Adams testified that he did not climb up on the roof to inspect the lanyards or anchors personally but that Joan Nelson, BD's safety representative, informed him that she had climbed the ladder and looked at the roof. Nelson testified:[4]

> So then I went up the ladder and looked on the roof, and was too nervous to go from the ladder on to the roof, because it was not stable in my opinion, because it was to a gutter that was loose and supported by one nail, and Jose when [sic] up on to the roof and held up the four anchors that had come with the roofing material, and they had just been left laying on the roof, and he held them up so that I could take photographs of them, and I was upset with the crew, because I had told them over and over, and not just on this site but others, that they need to be using the anchors, that they need to be tied off, that the lanyards had to be adjusted correctly, that ladders had to be secured, because they were creative in how they were attaching ladders from the ground to the roof or from roof to roof.

Certified Appeal Board Record Tr. (AR/Tr.) (Aug. 30, 2004) at 52-53. Asked whether she witnessed any improvements in BD's safety program over the course of her employment, she answered:

> Some, but it was minimal. It was frustrating, because management wasn't really supporting. They were giving the lip service to a lot of it looking for documentation . . . [m]inimal improvement with the demonstration of safe roofing practices and that. There was minimal improvement, but getting cooperation of management was very difficult. . . . It was just very frustrating. Anything that I would try to implement would be put off to the side. Either it costs too much for certificates, or it cost too much to put two more anchor points on to the roof, or they just

---

[4] Nelson resigned from BD due to frustration over violations, but due to BD's motion in limine, her testimony was limited to the discovery responses provided by the Department.

wanted the daily visit documentation for the records, so that if they were to come to an appeal, they would have the documentation—

AR/Tr. (Aug. 30, 2004) at 68-69 (objections and rulings omitted). When asked about the workers' understanding of the safety regulations, Nelson stated that at least one of the crews would disregard the rules and only take directions to follow the rules from men, specifically BD president Bruce Duschel and comptroller Jose Suarez.

¶7 Duschel testified that: (1) each of the employees at the work site the day of the WISHA inspection had gone through a safety orientation when they joined the company; (2) BD hired full-time safety inspectors to visit each jobsite daily and that the safety inspectors had the power to hire and fire employees for not obeying company safety rules; (3) BD used a fall protection plan and provided the plan in both English and Spanish; and (4) BD's safety policy, safety orientation, and daily inspections were in place at the time of the citation.

¶8 BD's vice president, Spencer Ross, testified that the weather at the site was windy on the day of the inspection and that, in his opinion, BD properly posted the site specific fall protection plan but that the wind had blown it away. Ross also testified that BD's safety program was in effect when the Department issued this citation.

¶9 Suarez testified about the safety training BD gives its new employees. He said that most of the employees speak only Spanish but that BD does new-hire orientation in Spanish for those who need it.

¶10 Herbert Heinold, a safety consultant expert on WISHA regulations for fall protection,[5] testified on BD's behalf that the site specific fall protection plan was legally adequate. He affirmed that BD's company policy included an accident prevention plan, accident investigation, safety training, meetings regarding tools and equipment, and

---

[5] Heinold served as cochair for the Construction Advisory Council, the group responsible for drafting the WISHA fall protection code.

meetings on protection. Additionally, Heinold indicated that he believed BD's safety program was effective in practice, but during cross-examination he acknowledged that he did not know whether BD consistently enforced its disciplinary program.

¶11 Following the hearing, the IAJ recommended that the Board affirm the fall protection violation but vacate the fall protection work plan violation. The IAJ rejected BD's affirmative defense of employee misconduct for the fall protection violation, holding that although BD met the first three requirements of the affirmative defense, it failed to prove that it effectively enforced its safety program.

> Although this employer has a policy giving the safety director authority to terminate employees on the discovery of safety violations, there was no demonstration by this employer of a progressive disciplinary program designed to correct the unsafe behavior and how such a program has been implemented absent an inspection by [the Department]. Without being able to prove such enforcement[,] the employer cannot prevail on this defense.

Appeal Board Record (AR) at 26. The IAJ indicated that by vacating the fall protection plan violation, the penalty would be reduced to $21,600.

¶12 The Board denied BD's petition for review, making the IAJ's proposed decision and order the final order of the Board. BD sought review in superior court, but on April 28, 2006, the trial court affirmed the Board's orders with modifications to correct the IAJ's miscalculation of the penalty. "Because violation 1-1b was vacated, there were only 7 repeat violations not 8, and the penalty should therefore be reduced to $18,900." Clerk's Papers at 23. The Department does not challenge this modification.

¶13 BD appeals.

## ANALYSIS

I. Knowledge of the Violative Conditions

¶14 BD claims that the Department failed to establish the elements required by RCW 49.17.180(6) to sustain a

finding of a serious violation. Specifically, BD claims that substantial evidence fails to support the conclusion that BD knew or could have known of the violative conditions with the exercise of reasonable diligence.

¶15 We determine "whether there is substantial evidence to support the Board's findings and whether the Board's conclusion of law is appropriate based on these facts. Substantial evidence is evidence sufficient to persuade a fair-minded, rational person of the truth of the declared premise."[6] *Danzer v. Dep't of Labor & Indus.*, 104 Wn. App. 307, 319, 16 P.3d 35 (2000) (footnote and citations omitted), *review denied*, 143 Wn.2d 1020 (2001).

¶16 RCW 49.17.050(2) requires the Department to adopt occupational health and safety standards that are at least as effective as those promulgated by the United States Secretary of Labor under the federal Occupational Safety and Health Act of 1970 (OSHA), 29 U.S.C. §§ 651-678. We often consider decisions interpreting parallel federal OSHA regulations to determine what constitutes a WISHA violation. *Adkins v. Aluminum Co. of Am.*, 110 Wn.2d 128, 147, 750 P.2d 1257, 756 P.2d 142 (1998). The purpose of WISHA and the regulations promulgated under it is "to assure . . . safe and healthful working conditions for every man and woman working in the state of Washington." RCW 49.17.010. "WISHA is to be liberally construed to carry out this purpose." *Inland Foundry Co. v. Dep't of Labor & Indus.*, 106 Wn. App. 333, 336, 24 P.3d 424 (2001).

¶17 Chapter 49.17 RCW authorizes the Department "to issue citations and assess penalties against an employer for on site safety violations."[7] *Erection Co. v. Dep't of Labor & Indus.*, 121 Wn.2d 513, 517, 852 P.2d 288 (1993). In order to establish a serious violation of a WISHA safety regula-

---

[6]
The findings of the board or hearing examiner where the board has denied a petition or petitions for review with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive. RCW 49.17.150(1).

[7] *See* RCW 49.17.120, .130, .180.

tion, the Department " 'must prove that (1) the cited regulation applies; (2) the requirements of the standard were not met; (3) employees were exposed to, or had access to, the violative condition; (4) the employer knew or, through the exercise of reasonable diligence, could have known of the violative condition; and (5) there is a substantial probability that death or serious physical harm could result from the violative condition.' " *Wash. Cedar & Supply Co. v. Dep't of Labor & Indus.*, 119 Wn. App. 906, 914, 83 P.3d 1012 (internal quotation marks omitted) (quoting *D.A. Collins Constr. Co. v. Sec'y of Labor*, 117 F.3d 691, 694 (2d Cir. 1997)), *review denied*, 152 Wn.2d 1003 (2004).

¶18 " 'We interpret agency regulations as if they were statutes.' " *Roller v. Dep't of Labor & Indus.*, 128 Wn. App. 922, 926, 117 P.3d 385 (2005) (quoting *Cobra Roofing Serv., Inc. v. Dep't of Labor & Indus.*, 122 Wn. App. 402, 409, 97 P.3d 17 (2005), *aff'd*, 157 Wn.2d 90, 135 P.3d 913 (2006)). Our review is, therefore, de novo, but "[w]e give substantial weight to an agency's interpretation of statutes and regulations within its area of expertise. Accordingly, we will uphold an agency's interpretation of a regulation 'if it reflects a plausible construction of the language of the statute and is not contrary to the legislative intent' " and purpose of the enabling statute. *Roller*, 128 Wn. App. at 926-27 (emphasis omitted) (internal quotation marks omitted) (quoting *Cobra Roofing*, 122 Wn. App. at 409). But ultimately, we retain responsibility for interpreting a statute or regulation. *Children's Hosp. & Med. Ctr. v. Dep't of Health*, 95 Wn. App. 858, 864, 975 P.2d 567 (1999).

¶19 Here, BD claims that the Department failed to provide any evidence that BD Roofing had knowledge of or, through the exercise of reasonable diligence, could have known of this violative condition. Specifically, BD alleges, without citing to authority, that "[a]bsent a management official being present during these alleged violations, [the Department] cannot establish the necessary element of 'knowledge' as required by law." Br. of Appellant at 15.

Further, BD alleges that the only evidence about BD's efforts to discover violations was that it inspected its jobsites daily.

¶20 RCW 49.17.180(6) provides that

[f]or the purposes of this section, a serious violation shall be deemed to exist in a work place if there is a substantial probability that death or serious physical harm could result from a condition which exists, or from one or more practices, means, methods, operations, or processes which have been adopted or are in use in such work place, unless the employer did not, *and could not with the exercise of reasonable diligence*, know of the presence of the violation.

(Emphasis added.) A plain reading of the statute indicates that a serious violation cannot exist if (1) the employer did not actually know of the *presence of the violation* or (2) the employer *could not with the exercise of reasonable diligence* have known of the presence of the violation. BD's interpretation that a management official must be present to witness the alleged violation renders the phrase "and could not with the exercise of reasonable diligence" superfluous. We give effect to each word in a statute and will not adopt an interpretation that renders words useless, superfluous, or ineffectual. *City of Seattle v. State*, 136 Wn.2d 693, 698, 965 P.2d 619 (1998).

¶21 BD's interpretation of the statute would allow a compliance inspector to issue serious violation citations to an employer only if a management official were present while the violation was occurring. This is an absurd result, and "[w]e avoid readings of statutes that result in unlikely, absurd, or strained consequences." *Glaubach v. Regence BlueShield*, 149 Wn.2d 827, 833, 74 P.3d 115 (2003).

¶22 The Department interprets the requirement of an employer's knowledge of the violation to mean that the employer knows of the hazardous conduct or condition but need not know about the specific behavior that led to the citation. The Department relies on *In re General Security Services Corp.*, Nos. 96 W376 & 97 W463, Bd. of Indus. Ins.

Appeals (Wash. Dec. 15, 1998). In *General Security*, the Board determined that the employer knew that the most likely hazard to employees was an armed assault at the courthouse entrance by an irate or mentally unstable person. The Board's conclusion was based on witness testimony that the workers (1) were exposed to hazards while performing their duties, (2) were potentially exposed to fatal injury each day on the job, and (3) needed to complete safety training. *Gen. Sec.*, Nos. 96 W376 & 97 W463, at 9.

¶23 The Department also relies on several Occupational Safety and Health Review Commission cases showing that constructive knowledge is sufficient to prove knowledge of the violative condition. For example, in *Secretary v. Kokosing Construction Co.*, 17 O.S.H. Cas. (BNA) 1869, 1871-72 (1996), the commission found that, although there was no direct evidence that the employer knew that a dangerous section of rebar was uncovered, the compliance officer "observed the unguarded rebar in plain view when he entered the work area to conduct his inspection and that it would have been in plain view of the employees because the work area was 'traveled.' " The commission held that the "conspicuous location, the readily observable nature of the violative condition, and the presence of [employer's] crews in the area warrant[ed] a finding of constructive knowledge." *Kokosing*, 17 O.S.H. Cas. (BNA) at 1871; *see also Austin Bldg. Co. v. Occupational Safety & Health Review Comm'n*, 647 F.2d 1063, 1068 (10th Cir. 1981) (the employee welding in a precarious spot was easily observable, and a diligent foreman checking the safety of his workers would have discovered the hazardous conduct).

¶24 Here, the evidence shows that BD was aware of the fall hazards faced by its employees while working on roofs. BD's own safety manual dedicates an entire chapter to fall protection, including methods of restraint and fall arrest, and systems designed to keep employees from falling.

¶25 Additionally, the seven citations BD received in the previous three years for the same violation is persuasive

evidence that BD was aware of the propensity of its employees to ignore the safety regulations and work without fall protection equipment. In *Washington Cedar*, 119 Wn. App. at 916, we held that "evidence of similar past violations was sufficient to support a finding that [the employer] was on notice that its employees were not complying with its safety requirements." Additionally, the employer in *Washington Cedar* had only two prior fall protection violations, not seven as BD had. 119 Wn. App. at 910.

¶26 Furthermore, the violation was easily observable. WISHA's compliance officer observed the violation as he drove past the site. He found that four or five employees were in violation, including lead worker Diego Valentino. And Nelson testified that management (1) was unsupportive of her attempts to improve safety enforcement, (2) gave lip service regarding the safety procedures, (3) focused more on costs than safety, and (4) relied on the daily visit documentation solely to provide documentation if they had to appeal a citation. Combined with the seven prior fall protection violations, we find that substantial evidence supported the Board's determination that the Department proved its prima facie case of a serious violation.

## II. EMPLOYEE MISCONDUCT

¶27 BD claims that the Board erred by concluding that it failed to prove its affirmative defense of employee misconduct under RCW 49.17.120. Specifically, BD contends that it effectively enforced the rules established by its safety program.

¶28 RCW 49.17.120(5) establishes the requirements for the affirmative defense of unpreventable employee misconduct:

(a) No citation may be issued under this section if there is unpreventable employee misconduct that led to the violation, but the employer must show the existence of:

(i) A thorough safety program, including work rules, training, and equipment designed to prevent the violation;

(ii) Adequate communication of these rules to employees;

(iii) Steps to discover and correct violations of its safety rules; and

(iv) Effective enforcement of its safety program as written in practice and not just in theory.

¶29 The burden of proving the affirmative defense is on the employer. *Wash. Cedar*, 119 Wn. App. at 912; *see also Brock v. L.E. Myers Co.*, 818 F.2d 1270, 1276 (6th Cir. 1987).

¶30 To show that a safety program is effective in practice, evidence must support the employer's assertion that the employees' misconduct was an isolated occurrence and was not foreseeable. *Wash. Cedar*, 119 Wn. App. at 913. "[T]he Board has determined that prior citations for similar conduct may preclude the defense [of employee misconduct] because those prior violations provide notice to the employer of the problem, thereby making repeat occurrences foreseeable . . . . The existence of prior violations does not absolutely bar [the defense]; it is merely evidence that the employee conduct was foreseeable and preventable." *Wash. Cedar*, 119 Wn. App. at 913.

¶31 Here, the IAJ concluded:

This employer has demonstrated the first three parts of this affirmative defense. BD Roofing should be commended for having developed the safety program (Exhibit No. 6), having developed a fall protection work plan in English as well as Spanish for its Spanish-speaking employees, communicating these rules to the employees through bilingual training, and taking steps, through safety directors and corporate officers, to discover and correct violations to the safety rules. However, the employer failed to demonstrate that they have effective enforcement of their safety program. Although this employer has a policy giving the safety director authority to terminate employees on the discovery of safety violations, there was no demonstration by this employer of a progressive disciplinary program designed to correct the unsafe behavior and how such a program has been implemented absent an inspection by [the

Department]. Without being able to prove such enforcement[,] the employer cannot prevail on this defense.

AR at 26.

¶32 BD claims that the Board erred because it provided ample evidence to satisfy the fourth element of employee misconduct. BD cites to Duschel's testimony that it granted its safety inspectors the authority to hire and fire employees based on safety concerns and that the company's policy on the date of the inspection was that an employee could face dismissal for failing to follow its safety protocols. Finally, BD relies heavily on the testimony of Heinold that BD was using its disciplinary program to effectively enforce the company's safety regulations:

Q: Mr. Heinold, finally, do you have an overall opinion as to whether [BD's] safety program was effective in practice?

A: From what I have examined, I have seen their tool box meetings, seen their audits. I have seen some of their disciplinary action, and from what I have seen, yes.

AR/Tr. (Aug. 31, 2004) at 47.

¶33 BD also contends that the Department provided no admissible evidence to challenge Heinold's testimony and, therefore, BD met its burden of proof on the fourth element. But BD misunderstands the burden of proof for the affirmative defense of employee misconduct, which rests squarely with the employer. *Wash. Cedar*, 119 Wn. App. at 912.

¶34 The Department points out that BD failed to provide detailed information about its enforcement of its disciplinary program, which is fatal to its affirmative defense. The Department relies on *Legacy Roofing, Inc. v. Department of Labor & Industries*, 129 Wn. App. 356, 119 P.3d 366 (2005), *review denied*, 156 Wn.2d 1028, 133 P.3d 473 (2006), which demonstrates the quality and quantity of evidence that an employer must supply to prove employee misconduct.

¶35 In *Legacy Roofing*, the employer provided documentation showing that the employer issued fines to employees

caught violating the fall protection rules, but we held that the "documentary evidence showed inconsistent penalty enforcement and did not show that each employee who was cited for a violation was actually fined." 129 Wn. App. at 366. The Department asserts that BD failed to introduce any documented evidence that it disciplined its employees or implemented its written disciplinary program.[8]

¶36 RCW 49.17.120(5) requires an employer to show "[e]ffective enforcement of its safety program . . . *in practice* and not just *in theory*." (Emphasis added.) Merely showing a good paper program does not demonstrate effectiveness in practice. *Brock*, 818 F.2d at 1277.

> [A]n employer may defend the citation on the ground that, due to the existence of a thorough and adequate safety program[,] which is communicated and enforced as written, the conduct of its employee(s) in violating that policy was idiosyncratic and unforeseeable. By its nature, information with respect to the implementation of its written safety program will be in the hands of the employer, and it is not unduly burdensome to require it to come forward with such evidence.

*Brock*, 818 F.2d at 1277. Accordingly, BD had the burden of presenting evidence showing that it was implementing its safety program.

¶37 Here, BD provided no evidence that its inspectors had actually fired employees because they violated the safety rules. The fact that a company's written policy on the date of the inspection provided that an employee could face dismissal for failing to follow the employer's safety protocols is not sufficient evidence that the employer actually enforced the policy or dismissed any employees. BD's reliance on Heinold's testimony is also misplaced. During recross-examination, Heinold admitted that he lacked personal knowledge of whether BD consistently enforced its disciplinary sanction:

---

[8] The accident prevention plan submitted by BD Roofing includes a paragraph entitled "Disciplinary Policy," which outlines a three-step process for safety violations: (1) verbal warning, (2) written warning, and (3) termination.

Q: [Y]ou have no personal knowledge of whether the disciplinary program, which is set forth in the safety plan, was actually carried out . . . consistently, do you?

A: No.

AR/Tr. (Aug. 31, 2004) at 48. Finally, fall protection violations were clearly a recurring and foreseeable problem for BD, as shown by the seven repeat violations in the previous three years for failing to ensure that employees followed fall protection procedures.

¶38 Without evidence that BD effectively enforced its disciplinary program at the time of the violation and in consideration of BD's seven serious repeat violations, we find that substantial evidence supported the Board's decision that BD failed to establish the affirmative defense of employee misconduct.

¶39 The panel having decided that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

BRIDGEWATER and QUINN-BRINTNALL, JJ., concur.