IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| MAX J. KUNEY CO., | ) | |
| | ) | No. 38831-0-III |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WASHINGTON STATE DEPARTMENT | ) | UNPUBLISHED OPINION |
| OF LABOR & INDUSTRIES, | ) | |
| | ) | |
| Respondent. | ) | |

SIDDOWAY, J. — After being cited by the Department of Labor and Industries

(Department) for serious violations of two safety regulations covering elevating work

platform operation, Max J. Kuney Company (Kuney) unsuccessfully appealed to the

Board of Industrial Insurance Appeals (Board) and then to superior court. In this further

appeal, Kuney argues that its employee's knowing violation, contrary to his training and

work rules, should have caused the Board to find a lack of knowledge on its part or the

affirmative defense of unpreventable employee misconduct.

No. 38831-0-III
*Max J. Kuney Co. v. Dep't of Lab. & Indus.*

The Board reasoned that management's knowledge that workers were having difficulty performing their work in a safety-compliant way required more diligence from Kuney than was shown. Evidence supports its findings. We affirm.

Procedural Note

Contrary to proper procedure on appeal, Kuney assigns error to every consequential finding of fact entered by the Board, without then identifying how or why most of those findings are unsupported by evidence. It devotes its briefing instead to rearguing evidence favorable to Kuney and asking us to weigh the evidence differently than did the Board.

"When making a substantial evidence challenge, '[t]he appellant must present argument to the court why specific findings of fact are not supported by the evidence and must cite to the record to support that argument,' or they become verities on appeal." *Cantu v. Dep't of Lab. & Indus.*, 168 Wn. App. 14, 22, 277 P.3d 685 (2012) (quoting *Inland Foundry Co. v. Dep't of Lab. & Indus.*, 106 Wn. App. 333, 340, 24 P.3d 424 (2001)). Unsupported arguments need not be considered. *Id.* (citing *Bryant v. Palmer Coking Coal Co.*, 86 Wn. App. 204, 216, 936 P.2d 1163 (1997)). To correct for Kuney's error and enforce proper appellate review, we treat the Board's enumerated findings of fact 2 through 6 as verities, since Kuney fails to argue why any of those findings are unsupported by substantial evidence. We then address the evidence presented that

2

supports the Board's enumerated findings 7 through 9, which Kuney *does* contest, before

undertaking our analysis of the issues on appeal.

## FACTS AND PROCEDURAL BACKGROUND

On May 8, 2019, Anthony Adolph, an employee of Max J. Kuney Co., was

working on the underside of an overpass being constructed on Freya Street for the

extension of U.S. Highway 395 in Spokane County. Mr. Adolph was installing girder

stop pads, which required him to chip at concrete to make them fit. To access the

underside of the bridge, he was in a Genie man-lift. The basket of the man-lift did not fit

between the girders. *See* Administrative Record (AR) at 9 (Finding of Fact (FF) 2).

Previously, a worker had complained to a Kuney superintendent that there were

issues accessing the work area where the girder stop pads were being installed. The

workers needed to position themselves higher into the work space. The superintendent

went up on the man-lift and concluded he was able to perform the work. He informed the

workers they did not have issues and the work could be performed from the man-lift.

Alternative methods for safely accessing the work area were not considered. *See*

AR at 9 (FF 3).

On the date of the violations, Mr. Adolph was observed standing on the top rail of

the man-lift basket performing his work duties. To climb to the top rail, Mr. Adolph had

removed his safety harness and unclipped his safety lanyard from the manufacturer

provided and approved attachment to the basket. By standing on the top rail of the man-

lift basket, Mr. Adolph violated WAC 296-869-60040(1).[1] By not wearing his safety harness, he violated WAC 296-869-60040(2).[2] Each violation involved the risk of serious injury or death. *See* AR at 9 (FF 4).

At the time Mr. Adolph was standing on the top rail of the man-lift without fall protection, there was no superintendent at the jobsite. There was no employee on the jobsite who understood who was in charge in the absence of the superintendent. *See* AR at 10 (FF 5).

The Department issued a citation and notice, and later, a corrective notice of redetermination, citing Kuney for one serious violation of WAC 296-869-60040(1) and one serious violation of WAC 296-869-60040(2). It assessed a penalty of $1,600 for each violation. Kuney appealed the corrective notice of redetermination to the Board. *See* AR at 10 (FF 6).

At the time of the violations, two Kuney employees were working on the Freya project: Mr. Adolph and Joseph Herrera. Mr. Adolph, a carpenter, was a four-year Kuney employee with certification as an aerial lift operator. Mr. Herrera was a traffic control supervisor. That morning, Mr. Herrera had set out traffic cones to control the

---

[1] The regulation provides, "You must make sure persons working from the platform: (a) Keep a firm footing on the platform; and (b) Do not use guardrails, planks, ladders, or any other device to gain additional height or reach."

[2] It provides, "You must make sure all persons on the platform of boom-supported elevating work platforms wear a full body harness and lanyard fixed to manufacturer provided and approved attachment points."

flow of traffic below the overpass and then went up to sweep the top of the bridge. About once an hour, he went down to check on his traffic closure and see if Mr. Adolph needed any water.

Mr. Adolph was seen working from the guardrail on that day by Levi Thomure, a safety compliance officer for the Department who happened to be traveling southbound along the U.S. Highway 395 corridor. He saw signs warning of construction ahead and slowed down to weave his way through the traffic cones. As he passed through the worksite, he saw that someone was standing on the Genie's guardrail. He turned around, parked, and as he walked back toward the man-lift, photographed the legs that could be seen below the girders. When he reached the man-lift, he yelled up at the worker, who turned out to be Mr. Adolph, asking him to come down.

Mr. Adolph stepped into the basket and lowered the Genie lift. As he did, Mr. Thomure could see that Mr. Adolph was not tied off and not wearing his safety harness. Mr. Thomure took photos of the violations and measured the vertical wall Mr. Adolph was standing above, which stood approximately nine feet and two to three inches tall. Mr. Thomure then went to the top of the bridge and spoke with Mr. Herrera, who contacted Kelly Wiese, Mr. Herrera's and Mr. Adolph's supervisor. When Mr. Wiese arrived, Mr. Thomure initiated an opening conference with him on the hazards he had observed, which led to the citations presently on appeal.

Testimony at the hearing before the Board revealed that Mr. Adolph and Jesse Marshall, a second carpenter assigned to the girder stop pad installation task, mostly worked without supervision. Mr. Wiese was overseeing a larger project installing stormwater containment tanks for the city of Spokane, so he only regularly stopped at the Freya project in the morning and at the end of the day, on the way to and from the city project. Mr. Wiese testified at the hearing that Mr. Herrera was "[p]robably" in charge in his absence, AR at 320, because he was a foreman and the most senior of the Freya project workers. Mr. Herrera denied being a foreman on the Freya project, however, and both Mr. Herrera and Mr. Adolph expressed uncertainty as to who, if anyone, was expected to supervise in Mr. Wiese's absence.

When the Freya project had begun in approximately 2015, a wooden walkway was installed over the girders to allow laborers to work on the underside of the bridge. The project temporarily shut down in 2017 due to construction design issues, however, and the walkway was removed. When the project reopened in 2018, laborers worked from the basket of the Genie lift to install the girder stop pads. The Genie lift basket did not fit in between the concrete girders, so employees worked with their arms extended overhead to chip at the concrete and position the stop pads.

Mr. Wiese admitted at the appeal hearing that he was informed by either Mr. Adolph or Mr. Marshall that they were having trouble accessing their workspace from the

6

Genie basket.  In its decision, the Board attached importance to the following testimony

from Mr. Adolph:

> We was sent up there to fix some mistakes on the bridge and I put the man basket in between the girders all the way to the abutment.  When I got up there, there was no room to work, no room to work whatsoever.  What I had to do was chip out some concrete and I knew I was in the wrong and I knew I had training, but I was—I had—I was knowingly doing what I knew I wasn't supposed to, but for me it was just to get the job done I guess.  I had to take my harness off and I was chipping concrete at the moment and then I seen the WISHA guy below me and—yeah, I knew I was in the wrong.  I don't know.  I was trying to get the job done.

AR at 294.  Later, he testified:

> Like I said, I needed more room and I was just trying to—I guess rushed and I knew I was—I knew I was in the wrong, but I had girders on both sides of me and in front of me and a platform behind me.  I figured there had was [sic] no way I could fall, I mean, like 50 or 40 feet.  It was only going to be a few feet, so I was willing to take that risk.

AR at 298-99.

In response to the workers' complaints, Mr. Wiese went in the basket himself and

determined it "wasn't convenient" to perform the work from that location, but he was

able to do it.  AR at 327.  The Board noted that Mr. Wiese's response to the workers was

that "'they didn't have issues.  They just wanted to make it easier on themselves.  The

work was able to be done out of the man lift.'"  AR at 7 (quoting AR at 327).  The Board

also cited Mr. Wiese's statement that Mr. Adolph made the decision to stand on the

guardrail "'on his own.  It could have been completed the other way.  It just wasn't near

as easy.'"  AR at 7 (quoting AR at 317).

The Board upheld the citations. It found that Kuney "knew or with the exercise of reasonable diligence should have known of the presence of the violation[s]." AR at 10. Relevant to its determination were its observations that Mr. Wiese was on notice of the workers' concerns but failed to seriously address them. From that, the Board concluded that—as Kuney's safety and health director Tom Landwehr acknowledged in his testimony—it was human nature for workers to take the "'path of least resistance.'" AR at 7 (quoting AR at 373). Asked at the hearing if it is foreseeable that a worker struggling to do a task correctly might find another way, Mr. Landwehr answered, "'That's possible, but it might not also be safe.'" AR at 7 (quoting AR at 373).

The Board rejected Kuney's assertion of the affirmative defense of unpreventable employee misconduct. It observed that "Kuney appears to have a good and thorough written safety program," but concluded that "its safety program failed in practice" to deter Mr. Adolph's actions, which "were foreseeable under the circumstances." AR at 8. Kuney appeals.

## ANALYSIS

In appeals of agency decisions applying the Washington Industrial Safety and Health Act of 1973, chapter 49.17 RCW (WISHA), we review the Board's findings of fact and determine whether they are supported by substantial evidence and whether the factual findings support the conclusions of law. *Dep't of Lab. & Indus. v. Tradesmen Int'l, LLC*, 198 Wn.2d 524, 534, 497 P.3d 353 (2021). Review is limited to the

8

examination of the record before the Board; we will not reweigh the evidence. *Id.* (citing

*Potelco, Inc. v. Dep't of Lab. & Indus.*, 191 Wn. App. 9, 22, 361 P.3d 767 (2015)

(*Potelco* I)). The evidence and its reasonable inferences are viewed in the light most

favorable to the prevailing party in the highest forum that exercised fact-finding

authority—in this case, in the light most favorable to the Department. *Erection Co. v.*

*Dep't of Lab. & Indus.*, 160 Wn. App. 194, 202, 248 P.3d 1085 (2011). WISHA statutes

and regulations are to be interpreted liberally to achieve their purpose of providing safe

working conditions for every worker in Washington. *Tradesmen Int'l*, 198 Wn.2d at

534-35.

I.  SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDING THAT, THROUGH THE EXERCISE OF REASONABLE DILIGENCE, KUNEY COULD HAVE KNOWN THAT ITS WORKER WAS VIOLATING SAFETY REGULATIONS

When the Department charges a serious WISHA violation it must prove, as part of

its prima facie case, that "'(1) the cited standard applies; (2) the requirements of the

standard were not met; (3) employees were exposed to, or had access to, the violative

condition; (4) the employer knew or, through the exercise of reasonable diligence, could

have known of the violative condition; and (5) there is a substantial probability that death

or serious physical harm could result from the violative condition.'" *Potelco* I, 191 Wn.

App. at 21 (quoting *Pilchuck Contractors, Inc. v. Dep't of Lab. & Indus.*, 170 Wn. App.

514, 518, 286 P.3d 383 (2012)).

Kuney's only challenge to the Department's proof is to an alleged failure to prove that it knew, or through the exercise of reasonable diligence could have known, that Mr. Adolph was violating safety regulations to "get the job done." In evaluating whether an employer could have known of a violation through the exercise of reasonable diligence, courts look to the "'employer's obligation to inspect the work area, to anticipate hazards to which employees may be exposed, and to take measures to prevent the occurrence.'" *Erection Co.*, 160 Wn. App. at 206-07 (internal quotation marks omitted) (quoting *Koskosing Constr. Co. v. Occupational Safety & Hazard Rev. Comm'n*, 232 F. App'x 510, 512 (6th Cir. 2007)). Constructive knowledge may be proved through evidence that a violation was in plain view. *Potelco, Inc. v. Dep't of Lab. & Indus.*, 194 Wn. App. 428, 439, 377 P.3d 251 (2016) (*Potelco* II) (citing *BD Roofing, Inc. v. Dep't of Lab. & Indus.*, 139 Wn. App. 98, 109-10, 161 P.3d 387 (2007)).

Kuney first contends that it could not have known of the conduct because "Mr. Adolph received vast fall protection training, he had all the necessary fall protection equipment available at the inspection site, and Max Kuney diligently oversaw the inspection site to ensure that its employees followed the safety rules." Br. of Appellant at 10-11. The contention that Kuney diligently oversaw the inspection site is not supported by the evidence. Mr. Herrera testified that Mr. Wiese was at the Freya worksite "[o]nce or twice a day." AR at 204. Mr. Wiese testified that in May 2019, he was stopping at the Freya project "in the morning on my way to the other project and then on my way back

from the other project" and was "sometimes" there a third time. AR at 319-20. Mr. Landwehr, Kuney's director of safety and health and environment, testified that he would go to the company's project sites at least weekly. When neither Mr. Landwehr nor Mr. Wiese was not present, no worker understood himself to be responsible for supervision. This is not a sufficient presence to "ensure" that employees follow safety rules.

The fact that Mr. Herrera went down to Freya to check his traffic closure hourly and see if Mr. Adolph needed drinking water is not helpful to Kuney where the Board found that Mr. Herrera did not understand himself to be a supervisor. Kuney reargues that Mr. Wiese claimed Mr. Herrera should have known he was assigned as foreman, but the Board evidently found Mr. Herrera and Mr. Adolph to be more credible. Moreover, after the Department cited the May 8 violations, Mr. Landwehr's contemporaneous write-up of the disciplinary action taken against Mr. Adolph identified Mr. Wiese as both the superintendent and foreman at the Freya worksite.

Kuney also argues that it could not have discovered the violative conduct without exercising "absolute vigilance" given the "incredibly short duration of the violative conduct." Br. of Appellant at 12. The record on which it relies for the alleged "incredibly short duration," however, is compliance officer Mr. Thomure's testimony of how long he observed the violation before requesting that Mr. Adolph lower the lift and speak with him. Testimony established that Mr. Adolph had been doing the concrete chipping work for two weeks before he was sighted on the guardrail by Mr. Thomure. It

is unreasonable to assume that Mr. Adolph had been hindered in his work for two weeks and yet took no safety shortcuts until—fortuitously—the few moments that Mr. Thomure was present. This is particularly so because Mr. Adolph believed that being surrounded by the girders meant he was at risk of only a short fall to the lift platform.

The violations occurred in plain sight. Kuney emphasizes that during the majority of the day on May 8, Mr. Herrera was engaged in sweeping and cleanup on top of the bridge and would not have been able to see Mr. Adolph. But Mr. Adolph was easily seen by Mr. Thomure as he drove through Mr. Herrera's traffic closure. This is sufficient evidence that Mr. Adolph was within plain sight of other drivers or anyone else in the vicinity of the work. It was also plainly visible to Mr. Thomure that Mr. Adolph was not tied on and wearing his safety harness as the Genie's basket neared the ground. This is sufficient evidence that it would have been within the plain sight of others and particularly, as case law emphasizes, "a diligent foreman checking the safety of his workers." *BD Roofing*, 139 Wn. App. at 109 (citing *Austin Bldg. Co. v. Occupational Safety & Health Rev. Comm'n*, 647 F.2d 1063, 1068 (10th Cir. 1981)).

Substantial evidence also supports the Board's rejection of Kuney's argument that Mr. Adolph had a remedy that he would be expected to exercise: taking his concern up the ladder to Mr. Landwehr. According to the Board, "[t]he record . . . establishes that if a worker had tried to go up the chain to Mr. Landwehr, Mr. Landwehr would most likely have backed his superintendent. So, as a practical matter, it does not appear that there

12

was an option for resolution . . . ." AR at 8. Mr. Landwehr repeatedly and steadfastly testified that he would rely on Mr. Wiese's supervision and judgment. *See, e.g.*, AR at 362-63 ("I rely on our superintendents to make good solid safety decisions . . . . The decision was made by Kelly Wiese that that man lift could be used to get up there and Anthony Adolph could have accessed all the work he needed . . . ."), AR at 364 ("Kelly Wiese knew full well where those locations of that repair needed to be done and I rely on Kelly . . . ."), AR at 372 (agreeing with Mr. Wiese's handling of the workers' concerns).

Substantial evidence supports the Board's findings, and the findings support its conclusions.

II.     KUNEY FAILED TO PROVE ALL ELEMENTS OF THE AFFIRMATIVE DEFENSE OF "UNPREVENTABLE EMPLOYEE MISCONDUCT"

WISHA provides that a citation may not be issued "if there is unpreventable employee misconduct that led to the violation, but the employer must show the existence of:

> (i)  A thorough safety program, including work rules, training, and equipment designed to prevent the violation;
> (ii)  Adequate communication of these rules to employees;
> (iii)  Steps to discover and correct violations of its safety rules; and
> (iv)  Effective enforcement of its safety program as written in practice and not just in theory."

RCW 49.17.120(5)(a). Case law holds that the employer must show that the worker's conduct was idiosyncratic and not foreseeable. *Pro-Active Home Builders, Inc. v. Dep't*

13

*of Lab. & Indus.*, 7 Wn. App. 2d 10, 21, 465 P.3d 375 (2018) (citing *Wash. Cedar &*

*Supply Co. v. Dep't of Lab. & Indus.*, 119 Wn. App. 906, 916, 83 P.3d 1012 (2003)).

Kuney emphasizes its thorough safety program, including work rules and training.

But the Board concluded that Kuney failed to prove that its safety program was effective

in practice, which implicates the third and fourth elements of the defense.

While Kuney's evidence demonstrated a thorough written safety program, its

evidence of enforcement was lacking. It demonstrated a disciplinary system in place, but

even in the case of the violations cited by the Department, the disciplinary record states

that Mr. Adolph was disciplined only for failing to use fall protection equipment, not for

standing on the Genie's guardrail. While Mr. Landwehr testified that he reeducated Mr.

Adolph, the company disciplinary citation includes an "Action to be taken" field that

states only, "Strike One." AR at 662. Kuney produced no other evidence of action taken.

Kuney also failed to produce documentation of a weekly safety meeting for the week of

the reported violations in response to the Department's request for that record, although

Mr. Landwehr testified the meeting would have been held. Finally, Kuney produced no

evidence of disciplining any other employees consistent with its infraction policy. When

an employer invokes the affirmative defense of unpreventable employee misconduct, the

Board may rely on its lack of documented evidence of enforcement to determine that the

employer's safety program is not effective in practice. *Pro-Active Home Builders*, 7 Wn.

App. 2d at 22; *BD Roofing*, 139 Wn. App. at 113.

14

Finally, and as discussed in connection with the Department's evidence of the violations, the Board found Mr. Adolph's action to be foreseeable. Once employees had complained of the difficulty of performing the chipping work from the basket and Mr. Wiese had determined for himself that it "wasn't convenient" and "wasn't near as easy" as it had been from the walkway, the Board could reasonably conclude that the workers' ability to do the work in a safety-compliant way demanded closer supervision than was being provided by Kuney.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Siddoway, J.

WE CONCUR:

Fearing, C.J.

Pennell, J.