# COURT OF APPEALS, DIVISION III, STATE OF WASHINGTON

| | | |
|---|---|---|
| CACHE VALLEY ELECTRIC COMPANY, | ) | No. 40842-6-III |
| | ) | |
| Respondent, | ) | |
| | ) | **ORDER GRANTING** |
| v. | ) | **RECONSIDERATION** |
| | ) | **AND WITHDRAWING** |
| WASHINGTON STATE DEPARTMENT OF | ) | **OPINION FILED** |
| LABOR AND INDUSTRIES, | ) | **MARCH 12, 2026** |
| | ) | |
| Appellant. | ) | |

The court has considered the Department of Labor and Industries' motion for reconsideration of this court's opinion dated March 12, 2026, and is of the opinion the motion should be granted.

THEREFORE, IT IS ORDERED that the Department of Labor and Industries' motion for reconsideration is hereby granted.

The panel has voted to withdraw the opinion filed on March 12, 2026, so as to make mostly nonsubstantive changes on pages 7, 8, and 9;

THEREFORE, IT IS ORDERED that the opinion filed March 12, 2026, is hereby withdrawn and a new opinion shall be filed this day.

PANEL: Judges Lawrence-Berrey, Cooney, and Murphy

FOR THE COURT:

_____
TRACY STAAB
CHIEF JUDGE

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| CACHE VALLEY ELECTRIC COMPANY, | ) ) ) | No. 40842-6-III |
| Respondent, | ) ) | |
| v. | ) ) | PUBLISHED OPINION |
| WASHINGTON STATE DEPARTMENT OF LABOR AND INDUSTRIES, | ) ) ) | |
| Appellant. | ) ) | |

LAWRENCE-BERREY, J. — The Department of Labor and Industries (Department) assessed penalties against Cache Valley Electric Company for two serious safety violations. The first violation was because a worker used a chainsaw well within the minimum approach distance of an exposed power line. The second violation was because Cache Valley had expired rubber protective blankets at the worksite stored in its truck.

The Board of Industrial Insurance Appeals (Board) unanimously affirmed the first penalty. But in a split decision, it vacated the second penalty. In the split decision, a majority reasoned that the stored protective blankets were not "used," within the meaning of WAC 296-45-255(7).

No. 40842-6-III
*Cache Valley Elec. v. Dep't of Lab. & Indus.*

The Department appeals the Board's conclusion that the expired protective blankets were not "used." It argues "used" should be construed in a manner that promotes worker safety, and worker safety is best promoted by prohibiting employers from making expired protective blankets available at the worksite. We agree with the Department.

Cache Valley appeals the Board's determination of its penalty for using the chainsaw within the minimum approach distance of the exposed power line. It argues that the fine should be less because the chainsaw encroached within the minimum approach distance for only 30 seconds, not for 15 minutes, as testified to by the safety officer. We conclude that the Board did not abuse its discretion by placing significance on the closeness the chainsaw came to the exposed power line because accidental contact with the line created the greatest risk of serious injury or death.

We partly reverse and partly affirm the Board.

FACTS

On September 2, 2021, a compliance and safety officer for the Department of Labor and Industries observed Cache Valley Electric Company employees working on overhead power lines. The bucket of Cache Valley's boom truck was extended above energized wires. One employee was using a gas powered chainsaw. Another was using

2

an insulating stick to keep an energized line away from the bucket.  A nearby line was insulated by a rubber "taco" but the line the employees were working on was not.  The employee with the chainsaw came within 12 inches of the power line,[1] well within the minimum approach distance of 27 inches.[2]  The employees acknowledged they violated the minimum approach distance and were aware of the hazard.

At the request of the safety officer, the crew removed all of the safety materials stored on the boom truck for inspection.  No rubber glove bags or additional insulating tacos were presented, but there were five cylinders presented—each containing a protective insulating rubber blanket.  These blankets must be dielectrically tested every 6 months and bear markings or identification of the date of the test or the expiration date.  The blankets were most recently tested on October 12, 2020, 11 months prior.  Some of the blankets had visible wear.

---

[1] The Board found that the chainsaw came "within 12 inches of the cross arm, and severed the cross arm."  Clerk's Papers at 10.  At oral argument, both parties agreed that the Board intended the first reference to "crossarm" to be "power line."  Wash. Ct. of Appeals oral arg., *Cache Valley Elec. Co. v. Dep't of Lab. & Indus.*, No. 40842-6-III (Jan. 27, 2026), at 5 min., 10 sec., *audio recording by* TVW, Washington State's Public Affairs Network, http://www.tvw.org.

[2] The "minimum approach distance" is a term of art and is determined by reference to the voltage of the exposed power line.  Cache Valley agrees that the minimum approach distance, given the voltage of the exposed line here, was 27 inches.

The safety officer issued a citation to Cache Valley for two safety violations.

"Item 1" read:

> The employer did not ensure that WAC 296-45-325(4) was adhered to in that two employees were observed taking a conductive object closer to exposed energized parts than [27 inches, the minimum approach distance].
>
> The power line was energized at 7200 volts phase to ground /12,470 [volts] phase to phase.
>
> Employees contacting exposed energized high voltage power lines while holding conductive objects could result in serious injury, including death.

Clerk's Papers (CP) at 412. The safety officer listed the violation type as "serious" and assessed a penalty of $7,000.

"Item 2" read:

> The employer did not ensure that rubber protective equipment had been dielectrically tested within six months . . . . Outdated protective equipment could fail and cause death or serious injury.

CP at 412. The safety inspector listed the violation type as "serious" and assessed a penalty of $6,000.

Cache Valley appealed the citations and penalties.

The safety officer testified that the chainsaw was within the minimum approach distance for approximately 15 minutes. The cutting itself took only "[a] few minutes." CP at 274. He said although it might take less time to cut through the crossarms on the

power pole, "[the conductive object is] still there as they're reaching into the area and then removing it from that." CP at 274. He also stressed that the 15-minute time frame was an approximation. James Rimer, general foreman for Cache Valley in the high voltage section, testified it would take only 15 to 30 seconds for a chainsaw to cut a power pole's arm. The industrial appeals judge (IAJ) upheld the citations and penalties for both items.

Cache Valley appealed the IAJ's decision to the Board of Industrial Insurance Appeals. The Board unanimously upheld the Department's citation and penalty related to the chainsaw being within the minimum approach distance of the exposed power line. In affirming, the Board found that the acting foreman knew, or should have known, that the chainsaw encroached on the minimum approach distance of the exposed line on which the employee was working. It further found that the workers were not using rubber gloves and that the acting foreman should have known that leather gloves were insufficient insulation because even rubber gloves would have been insufficient given the voltage of the exposed power line. The Board described the violation as "serious" because "[i]f contact with an exposed energized part were to complete an electrical circuit, the workers in the bucket and the workers below on the ground could be exposed to serious injury or death." CP at 10.

5

The Board split on whether the Department proved that Cache Valley had "used" the expired rubber protective blankets by bringing them to the worksite. A majority of the Board construed "used" to require proof that the expired blankets were placed on a power line. The dissent characterized the majority's decision as setting "a dangerous precedent that is contrary to statute, case law, and the intent of the Washington Industrial Safety and Health Act [of 1973] (WISHA)[, chapter 49.17 RCW]." CP at 12. The dissent reasoned that one key purpose of WISHA is "to define and defuse hazardous situations before they become hazardous" and, in this case, "the hazards are rubber protective blankets that have not been dielectrically tested within six months as required by safety laws." CP at 13. The dissent emphasized that the blankets were accessible to employees and stored with the other safety equipment on the work truck. "The danger of using an expired rubber blanket that has a defect in it is severe neurological damage, loss of limbs, amputations, or death. And WISHA was not created to require an employee to actively put themselves in harm's way in order to find a violation of the act." CP at 13 (footnote omitted).

Cache Valley appealed the Board's decision to superior court. The reviewing court reduced the monetary penalty for Item 1 to $3,000. It also affirmed the Board's vacation of Item 2. The Department appealed to this court.

6

ANALYSIS

We review the Board's interpretation of statutes and regulations de novo. *Erection Co., Inc. v. Dep't of Lab. & Indus.*, 160 Wn. App. 194, 201, 248 P.3d 1085 (2011). Various rules inform our de novo review.

The legislature enacted WISHA for the purpose of "assur[ing], insofar as may reasonably be possible, safe and healthful working conditions for every man and woman working in the state of Washington." RCW 49.17.010. The legislature delegated broad authority to the Department to adopt regulations to meet the general safety principles set forth in WISHA. RCW 49.17.040. We construe WISHA statutes and regulations liberally to achieve the purpose of providing safe working conditions for workers in Washington. *Bayley Constr. v. Dep't of Lab. & Indus.*, 10 Wn. App. 2d 768, 781, 450 P.3d 647 (2019).

We give substantial weight to an agency's interpretation of statutes and regulations within its area of expertise. *BD Roofing, Inc. v. Dep't of Lab. & Indus.*, 139 Wn. App. 98, 107, 161 P.3d 387 (2007). If an agency's interpretation of a regulation reflects a plausible construction of the language and is not contrary to the legislative intent, we will uphold it. *Id.* "But ultimately, we retain responsibility for interpreting a statute or regulation." *Id.*

A.      *Whether "use," in the context of WAC 296-45-255(7), includes making rubber protective equipment available at the worksite*

The relevant part of the challenged regulation reads, "Rubber protective equipment must not be *used* unless it has been dielectrically tested within six months and bears marking or identification of the date of the test or the expiration date." WAC 296-45-255(7) (emphasis added). The administrative code does not define "used" in the context of WAC 296-45-255(7).

The Department argues the Board erred by construing "used" narrowly to require proof that the expired protective blankets were placed on a power line. It argues that "used" should be construed broadly to mean "issued" or "put into action or service," so as to apply when rubber protective equipment is made available at a worksite.[3] Resp't's Br. at 20.

We interpret agency regulations in the same manner we interpret statutes. *P.E.L. v. Premera Blue Cross*, 2 Wn.3d 460, 494, 540 P.3d 105 (2023). When a term is not defined in a statute, we find its plain meaning by resorting to its dictionary definition.

---

[3] Cache Valley argues the Board's finding that the protective blankets were not "used" is conclusive. We disagree. The Board's decision was not based on a dispute of fact but on its interpretation of what "used" means. As noted above, interpreting a regulation is a question of law.

*State v. Watson*, 146 Wn.2d 947, 954, 51 P.3d 66 (2002). *Webster's Dictionary* defines

"use" in relevant part as

> **2:** to put into action or service **:** have recourse to or enjoyment of **:** . . .
> **3:** to carry out a purpose or action by means of **:** make instrumental to an
> end or process **:** . . .
> **syn** EMPLOY, UTILIZE, APPLY, AVAIL: USE is general and indicates any
> putting to service of a thing, usu. for an intended or fit purpose or person.

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2523-24 (1993). One part of the

definition supports Cache Valley's narrow construction: "used" means "utilized."

Whereas another part of the definition supports the Department's broad construction:

"used" means "any putting to service."

Between these two choices, the correct meaning of "used" is the meaning that best

furthers the purpose of WISHA, which is worker safety. Narrowly construing "used"

would allow expired rubber protective equipment to be made available for use at a

worksite. This would require workers to choose between not using safety equipment

when it should be used or using safety equipment that might be unsafe. This was the

choice Cache Valley workers faced. Neither choice was safe. Whereas broadly

construing "used" would require employers to ensure that rubber protective equipment

made available at a worksite is tested as required by the rule. Use of safe equipment

furthers worker safety.

9

We hold that rubber protective equipment is "used," within the meaning of WAC 296-45-255(7), when an employer makes the equipment available at the worksite. Here, Cache Valley made expired protective blankets available to its workers at the worksite. In doing so, it violated WAC 296-45-255(7).

We conclude that the Board erred in its interpretation of WAC 296-45-255(7), and we reinstate the Department's citation and penalty for Item 2.

B.   *Whether the Board abused its discretion in assessing the fine for Item 1*

Cache Valley argues that substantial evidence does not support the Board's penalty determination for Item 1. We disagree.

We review the Board's penalty determination for an abuse of discretion. *Ostrom Mushroom Farm Co. v. Dep't of Lab. & Indus.*, 13 Wn. App. 2d 262, 276, 463 P.3d 149 (2020). An abuse of discretion occurs where the decision is arbitrary or rests on untenable grounds or reasons. *Id.*

WISHA penalties are determined by assessing the gravity of the violation, which is calculated by multiplying a violation's severity rate by its probability rate. WAC 296-900-14010. Both rates are scored as either a 1, 2, or 3. *Id.* Cache Valley agrees that the severity rate of Item 1's violation is a 3 but disputes the probability rate as also being a 3.

The regulation defines "probability rate" as

[the] number that describes the likelihood that an injury, illness, or disease will occur ranging from 1 (lowest) to 3 (highest).
– When determining probability, [the Department] considers a variety of factors, depending on the situation, such as:
- Frequency and amount of exposure.
- Number of employees exposed.
- Instances, or number of times, the hazard is identified in the workplace.
- How close an employee is to the hazard, i.e., the proximity of the employee to the hazard.
- Weather and other working conditions.
- Employee skill level and training.
- Employee awareness of the hazard.
- The pace, speed, and nature of the task or work.
- Use of personal protective equipment.
- Other mitigating or contributing circumstances.

WAC 296-900-14010.  The probability rate is set at 3 "[i]f the factors considered indicate

the likelihood of injury or illness would be relatively high." *Id.*

We now set forth the relevant portion of the Board's penalty analysis:

This was a serious violation.  If contact with an exposed energized part were to complete an electrical circuit, the workers in the bucket and the workers below on the ground could be exposed to serious injury or death. . . .  Severity was at the highest possible level, because any injury from such high levels of electrical voltage or burns from electrical arc flashes could result in serious injury or death, including electrocutions or burns sufficient to cause loss of body parts or death. . . .

> Probability[4] was at the highest possible level, because: the action of
> cutting off the cross arm with the chainsaw had encroached deeply into
> [the] minimum approach distance of 27 inches; that placed the workers
> very close to potential points of risk of death or serious injury by
> electrocution or arc flash; and the workers had not covered the line on
> which they were working with a taco or a currently dielectrically tested
> rubber blanket. . . .

CP at 33. The Board then considered mitigating and exacerbating factors and concluded

that no adjustment of the penalty was warranted.

Cache Valley argues that the Board failed to properly consider all mitigating

factors and that substantial evidence does not support a probability factor of 3.

It specifically challenges the safety officer's testimony that the chainsaw was within

27 inches of the power line for 15 minutes and argues it takes only 30 seconds to cut a

power pole's crossarm. We are unpersuaded by Cache Valley's argument.

First, the regulation does not require that each probability factor be considered.

Rather, the regulation lists numerous factors to be considered and provides discretion

regarding which to apply, "depending on the situation." WAC 296-900-14010.

Although there were several possible mitigating factors the Board could have considered,

whether and what factors it chose to consider were within its discretion.

---

[4] We altered the quote so the probability factor is listed in a separate paragraph.

12

Second, the Board did not abuse its discretion by emphasizing how close the chainsaw came to contacting the exposed high voltage power line and seemingly disregarding the disputed fact of how long the chainsaw was within the minimum approach distance of the power line. We note that Cache Valley did not directly contradict the safety officer's testimony that the chainsaw was within the minimum approach area of the exposed power line for 10 to 15 minutes. It contradicted only the time it takes to cut a crossarm.

Regardless, running a gas powered chainsaw for even 30 seconds in close proximity to an unprotected power line carrying 7,200 volts phase to ground carries with it a relatively high risk of injury. Twelve inches between a gas chainsaw and an unprotected high voltage power line is a small margin of error, especially when several feet above the ground in a mechanical bucket. The grounds for the Board's probability assessment were not arbitrary, nor did they rest on untenable grounds or reasons. The Board's emphasis on the degree the chainsaw encroached into the minimum approach distance was a key factor in the likelihood of accidental contact with the power line. We conclude that the Board did not abuse its discretion is assessing the probability of harm factor in its penalty calculation for Item 1.

13

No. 40842-6-III
*Cache Valley Elec. v. Dep't of Lab. & Indus.*

Reversed in part and affirmed in part.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____
Cooney, J.

_____
Murphy, J.

14